[Cite as *State v. Hunter*, 2014-Ohio-4649.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 14AP-163 |
| v. | : | (C.P.C. No. 13CR-1787) |
| Peter A. Hunter, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 21, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

*W. Joseph Edwards*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Peter A. Hunter, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of two counts of aggravated robbery, having a weapon while under disability ("WUD"), and the accompanying firearm and repeat violent offender ("RVO") specifications. For the reasons that follow, the judgment of the trial court is affirmed.

I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} This matter relates to events that occurred on March 23, 2013 at the Travelodge hotel on West Broad Street in Columbus, Ohio, where Jessica Devore and her long-time boyfriend Danny Lowe, III, were living with their two children. According to Devore, due to problems obtaining housing, they began staying at the Travelodge in the

fall of 2012.  During their time at the Travelodge, Devore became aware of other people living there.  One person, known to her as Craig, lived across the parking lot and his children occasionally played with Devore's children.  Craig and Devore often talked, and approximately one month prior to the events in questions, they had a conversation during which Devore asked Craig if he knew where she could get some Xanax.  Craig told Devore that he did not, but would let her know if he got any.

{¶ 3}  On February 22, 2013, Devore received a tax refund of approximately $4,100.  Devore obtained the entire amount in cash, and it was primarily in $20 denominations that she kept bound with her daughter's hair ties.  According to Devore, she and Lowe were going to use the money for a deposit on a rental apartment and they were supposed to move into said apartment on March 26, 2013.  Though she testified that she did not tell Craig specifically about the money, she stated she had previously mentioned to him that "[a]s soon as I get my taxes, I'm out of here" and that "within the month" she would be gone.  (Tr. 86.)

{¶ 4}  On March 22, 2013, Devore, Lowe, and the children were at Lowe's brother's house where they stayed until approximately midnight.  After Devore, Lowe, and their son returned to the Travelodge, Craig called and told Devore that a couple of his friends had Xanax that were two dollars a pill.  Devore told Craig she wanted to discuss it with Lowe and for Craig to call her back.  When Craig called the second time, Devore told him that she would take the Xanax.  Craig called Devore a third time and told her that his friends would be there soon, and then Craig called again to tell Devore that his friends were about to walk over.

{¶ 5}  Moments later, Devore walked out of the bathroom and saw Lowe with the front door open and two males standing there.  Through their conversations, it was said that the pills were three dollars.  As Lowe reached down toward Devore's purse to get the money, the taller of the two men hit Lowe with a gun and said "[g]ive me all your money." (Tr. 93.)  According to Devore, Lowe refused and the taller man started shooting.  Lowe fell to the ground and "there was this blood squirting everywhere."  (Tr. 93.)  The taller man then ran out, but the shorter man remained in her room.  Devore's son woke up screaming, and the shorter man grabbed her son, pointed a gun at him, and told Devore he would kill her son if she did not give him her money.  Devore testified she was saying

"[p]lease don't shoot my son," and the man let go of her son. (Tr. 95.) Devore grabbed her son and "threw him in the bathroom and shut the door." (Tr. 95.) Devore testified:

> He said, "Give me your money now." Where Danny is laying, I had to step over Danny to get my purse because it was sitting beside of the refrigerator.
>
> When I bent down, I was going to get the money out. I unzipped it. When I did, he hit me, took the purse and ran. I jumped up, looked outside, locked the door, called 911.

(Tr. 96.)

{¶ 6} Police and medics arrived and Lowe was transported to the hospital while Devore provided police with her statement of what happened. Shortly thereafter, appellant was arrested and Devore identified appellant as the man who pointed the gun at her son. Devore stated she was "[o]ne hundred percent" sure in her identification of appellant, and Devore also identified appellant at trial. (Tr. 101.) Devore testified that, though Lowe survived the shooting, he is a quadriplegic and, due to complications, still remained hospitalized at the time of trial.

{¶ 7} Columbus Police Officers Shane Sprague and Michael Segna heard the description that a female caller stated that two black males had shot her husband and taken her purse. As they were responding to the scene, the officers observed two black males walking northbound away from the Travelodge. Upon seeing the officers, the two men "split off" which caused the officers to stop them. (Tr. 185.) One man, Derrick Wade, had a revolver in his front pocket with two spent and three live rounds of ammunition. Officers also discovered that Wade had been shot, and, therefore, Wade was transported to a hospital.

{¶ 8} The other man, appellant, had a "wad of cash" consisting of several $20 bills tied with yellow hairbands. (Tr. 206.) Appellant first told officers that there should be about $1,960 and that he had just come from the casino. Appellant then told officers that he met a man at McDonalds who gave him $2,000 to buy Percocet and that, as he was going to make the purchase, he saw two individuals running away from the hotel. According to appellant, one man ran toward an Arby's restaurant and the other man ran toward Broad Street.

{¶ 9} Later that morning, appellant was interviewed at Columbus Police Headquarters by Columbus Police Detective Arthur Hughes. During the interview, appellant admitted that he went to Devore's room at the hotel and that a confrontation between a man named Derrick and "some white guy" occurred. (Tr. 325.) Appellant explained to Detective Hughes that earlier that evening, a man known as D, who police later identified as the man Devore knew as Craig, approached appellant and told appellant there is a man at the hotel that wants to buy some Xanax. Appellant said that D told him the guy has "like five, six thousand dollars in cash on him." (Tr. 322.) Appellant then talked with Wade who told appellant that he had some Xanax. After talking with D, appellant and Wade proceeded to the hotel room. Appellant told Detective Hughes that Derrick and the other man started wrestling with each other and then he heard "pop, pop." (Tr. 325.) Appellant then said that he "grabbed the money" and put it in his pockets. (Tr. 326.) Also during this interview, appellant told Detective Hughes that both Derrick and the white guy had guns and that he ran away from the scene as shots were being fired. According to appellant's interview, Wade had a black gun, and Lowe had a "chrome gun." (Tr. 328.)

{¶ 10} Police interviewed Devore again at the hospital to determine how Wade was shot. Devore testified she did not recall the interview she gave at the hospital relating to how Wade may have gotten shot. However, Devore testified that she believed Lowe had his .45 caliber Smith & Wesson on his person when he answered the door because "[h]e would not have answered the door without a gun on him." (Tr. 104.) Evidence was also presented at trial that, during her interview at the hospital, Devore said she got the gun and gave it to Lowe and helped him pull the trigger because Lowe was unable to move. Also, during this interview, Devore asked if she was going to be charged with attempted murder.

{¶ 11} At trial, Devore testified that she did not recall the interview and that what she told police during that interview was "[n]ot true at all." (Tr. 157.) Devore testified, "I don't know if it was because I was traumatized, not trying to get [Lowe] in trouble. I don't know why I would say that, but I did say that. That is my voice." (Tr. 157.) According to her testimony at trial, if Wade was shot, Lowe must have shot him at some point during the altercation. Devore also testified that the gun appellant pointed at her and her son

was "chrome, like, silver, kind of like [Lowe's]. It looked like [Lowe's]." (Tr. 161.) Additionally, Devore stated that she does not know what happened to Lowe's gun after the events in question and that the gun appellant used to threaten her and her son "could have been" Lowe's gun. (Tr. 167.)

{¶ 12} On the side of the hotel, police found Devore's purse and her prescription medication. Both appellant and Wade tested positive for gunshot residue on their hands. A .45 caliber spent shell casing was collected from the hotel room, and a spent projectile was recovered from the bathroom door. No firearms were recovered at the scene, though the parties stipulated that the firearm recovered from Wade was a .38 Special revolver that was operable. Additionally, the parties stipulated that, if called to testify, Mark Hardy, an expert in firearm examination, would testify that the spent .38 caliber bullet collected at the scene was fired from the revolver recovered from Wade. Additionally, Hardy would testify that the .45 caliber spent bullet was not fired from the revolver. The parties also stipulated that appellant had a prior robbery conviction.

{¶ 13} On April 1, 2013, appellant was indicted and charged with two counts of robbery, one count of felonious assault, one count of attempted murder, one count of kidnapping, and one count of WUD. Appellant was also charged with a firearm and an RVO specification. The jury returned guilty verdicts on both of the aggravated robbery charges and the accompanying firearm specifications, but was unable to reach a verdict with respect to the charges for felonious assault, attempted murder, and kidnapping. Having entered a jury wavier on the WUD charge, the trial court found appellant guilty of WUD, as well as the RVO specification. A sentencing hearing was held, and the trial court imposed an aggregate imprisonment term consisting of 27 and one-half years.

## II. ASSIGNMENT OF ERROR

{¶ 14} Appellant timely appealed and brings the following assignment of error for our review:

> The trial court erred when it entered judgment against the appellant when the judgment was not supported by the manifest weight of the evidence.

## III.  DISCUSSION

{¶ 15} Though his stated assignment of error challenges only the weight of the evidence presented at trial, the argument in appellant's appellate brief seemingly challenges both the weight and sufficiency of the evidence presented.  Accordingly, our analysis will include a discussion of both.

{¶ 16} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 17} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence supports the conviction.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

{¶ 18} In contrast to assessing the sufficiency of the evidence, when presented with a manifest weight challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial

ordered.  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Id.*, quoting *Martin* at 175.

{¶ 19} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 20} As is relevant here, R.C. 2911.01(A) provides in part:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>
> (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;
>
> (3) Inflict, or attempt to inflict, serious physical harm on another.

{¶ 21} To be convicted of an accompanying firearm specification, a defendant must have had a firearm on or about his person or under his control while committing the aggravated robbery and either displayed, brandished or indicated that he possessed the weapon or used the firearm to facilitate the aggravated robbery.  R.C. 2941.145.  As is relevant to this case, R.C. 2923.13(A)(2) prohibits a person from knowingly acquiring, having, carrying or using any firearm or dangerous ordnance if "[t]he person is under indictment for or has been convicted of any felony offense of violence."

{¶ 22} In arguing that his convictions must be reversed, appellant challenges Devore's credibility and her testimony that appellant had a firearm on his person, even

though he was unarmed at the time of his arrest.  Additionally, appellant argues that, even if Devore is to be believed, there is no evidence that the firearm appellant allegedly had was operable.  We find these arguments unpersuasive.

{¶ 23} " 'Although a defendant may be charged in an indictment as a principal, the court may instruct the jury on complicity where evidence at trial reasonably supports a finding that the defendant was an aider or abettor.' "  *State v. Gonzalez*, 10th Dist. No. 10AP-628, 2011-Ohio-1193, ¶ 24, quoting *State v. Blackburn*, 5th Dist. No. 06 CA 37, 2007-Ohio-4282, ¶ 41, citing *State v. Tucker*, 8th Dist. No. 88231, 2007-Ohio-1710, ¶ 15.  Here, the trial court instructed the jury that appellant could be convicted of the charged offenses as an aider or abettor.  The complicity statute, R.C. 2923.03(A), provides in pertinent part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * *: (2) [a]id or abet another in committing the offense."

{¶ 24} To aid and abet means " 'to assist or facilitate the commission of a crime, or to promote its accomplishment.' "  *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001), quoting Black's Law Dictionary (7th Ed.Rev.1999).  In *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist.1971), the court stated that a common purpose among two people "to commit crime need not be shown by positive evidence but may be inferred from circumstances surrounding the act and from defendant's subsequent conduct."  "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."  *Id.*

{¶ 25} The evidence presented by the state in this case supports appellant's convictions either as a principal offender or as an accomplice.  The evidence demonstrated that appellant and Wade went to Devore's room together for the purpose of selling Xanax.  Devore testified that once there, Wade demanded that Lowe give him their money and when Lowe refused, Wade shot him.  Wade fled, while appellant threatened Devore and her son with a gun.  According to Devore, appellant stated he would kill Devore's son if she did not give him the money.  Appellant then took Devore's purse and ran from the scene.  Appellant and Wade were apprehended close to the scene shortly after the shooting.  Once apprehended, appellant was found with $2,000 in cash wrapped in yellow hairbands.  Wade was found with a revolver, and the state presented evidence that this revolver was operable and that a bullet collected from the scene was fired from

this revolver. Additionally, there was evidence presented from which the jury could infer that Wade's gunshot wound was inflicted by Lowe's gun and that Lowe's gun was the same gun appellant used to threaten Devore and her son.

{¶ 26} Construing the foregoing evidence in a light most favorable to the state, it was reasonable for the trier of fact to conclude beyond a reasonable doubt that appellant and Wade acted in concert in committing the aggravated robberies and the WUD. Consequently, we reject appellant's assertion that the record contains insufficient evidence to support his convictions for aggravated robbery and WUD, as well as the accompanying specifications.

{¶ 27} We next review appellant's argument that his convictions are against the manifest weight of the evidence. As previously noted, in conducting a manifest weight of the evidence review, though we consider the credibility of the witnesses, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Cattledge* at ¶ 6, quoting *Seasons Coal Co.* at 80. Though appellant suggests that Devore's testimony is not credible, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution's testimony. *State v. Anderson*, 10th Dist. No. 10AP-302, 2010-Ohio-5561, ¶ 19. Moreover, the jury was fully aware of the statements Devore made to police on the day of the incident and her testimony where she explained she did not recall being interviewed by police at the hospital, nor did she know why she told police at the hospital that she helped Lowe pull the trigger during the events in question. " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58; *State v. Clarke*, 10th Dist. No. 01AP-194 (Sept. 25, 2001).

{¶ 28} Because the jury is in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as witnesses' manner and demeanor, we cannot conclude this record presents a scenario where the jury clearly lost its way such that a reversal of appellant's convictions is required. Consequently, we find appellant's convictions are not against the manifest weight of the evidence.

{¶ 29} Having concluded that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, we overrule appellant's assignment of error.

## IV. CONCLUSION

{¶ 30} For the foregoing reasons, appellant's assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

TYACK and CONNOR, JJ., concur.

_____